UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

RANDY ELL

VERSUS

TURNER INDUSTRIES GROUP, LLC

CIVIL ACTION

NO. 15-230-JJB-RLB

## RULING

This matter is before the Court on Rule 12(b)(1) Motions to Dismiss and Compel Arbitration (Docs. 5 & 31)[1] filed by the defendant, Turner Industries Group, LLC ("Turner"). Alternatively, Turner asks the Court to stay the case pending arbitration. The plaintiff opposes the motions (Docs. 9 & 32). The Court has jurisdiction pursuant to 28 U.S.C. § 1331. For the following reasons, the defendant's Rule 12(b)(1) Motions to Dismiss and Compel Arbitration (Docs. 5 & 31) are **GRANTED**.

**I.    BACKGROUND**

Plaintiff, Randy Ell ("Ell"), filed a complaint against Turner pursuant to Title VII of the Civil Rights Act of 1964, alleging employment discrimination and retaliation on account of his race. *Compl.* 1-2, Doc. 1. Turner asserts that the plaintiff and Turner entered into a valid arbitration agreement that directs all of the plaintiff's claims to be resolved through arbitration. *Def.'s Mot. to Dismiss* 1, Doc. 5. The plaintiff asserts that the Court has jurisdiction over his claims because he never consented to a binding arbitration agreement covering his claims from May 24, 2012, through January 6, 2014. *Pl.'s Opp'n* 1, Doc. 9.

Ell began working for Turner around May 24, 2012, performing maintenance work at the Shell Motiva Convent Refinery. Ell alleges that he was harassed, insulted, mistreated, and subject

---

[1] The defendant filed a second Motion to Compel Arbitration (Doc. 32) after the plaintiff amended his complaint (Doc. 30). In the defendant's second Motion to Compel (Doc. 32), it incorporated the arguments contained in the first Motion to Compel (Doc. 5). Therefore, the Court addresses the arguments contained in both motions.

1

to unfair working conditions by his colleagues and supervisors on account of his race shortly after he was hired by Turner. After Ell was initially hired in 2012, Turner adopted a mandatory employee arbitration program that would become effective on January 31, 2013. Turner contends that the program included a Dispute Resolution Agreement ("DRA") which bound both Turner and its employees to resolve all disputes and controversies relating to employment exclusively through arbitration. *Def.'s Supp. Mem.* 2–3, Doc. 5-1.

After Ell filed racial discrimination complaints against Turner, Turner reassigned Ell to work at a different Shell location in Norco, Louisiana, on January 6, 2014. Before the reassignment, Ell alleges that he performed maintenance work five days per week from 7:00 a.m. to 3:00 p.m. Ell asserts that his transfer was a demotion in retaliation for his discrimination complaints because the transfer would require him to commute 80 miles roundtrip to work as well as twelve-hour work days, seven days per week until the job was completed. Ell refused the reassignment, and his employment with Turner ended on January 6, 2014.

One month later, on February 6, 2014, Ell returned to work for Turner, at which time he admits to signing a DRA. *Ell Decl.* 1, Doc. 13-1. The February 6, 2014, DRA contains a "Notice to New Employees/Re-Hires" which states:

> Any individual ["Employee"] who wishes to be employed by Turner . . . must read and sign the following Dispute Resolution Agreement as part of their hiring package. You may stop the hire-in process at this point and take the time to review these materials further if you desire to do so. You must, however, complete this agreement if you wish to continue the hire-in process and if you wish to be employed by the Company. <u>All company employees hired on or after January 31, 2013, are required to agree to the Dispute Resolution Agreement below.</u>

*Notice to New Employees/Re-Hires* 1, Doc. 7-2. The February 6, 2014, DRA states in pertinent part:

> Both Employee and the Company agree to resolve any and all claims, disputes or controversies arising out of or relating to Employee's employment with the Company exclusively by binding arbitration . . . Employee understands that

2

> Employee must arbitrate any and all claims against the Company and that Employee may not file a lawsuit in any court in regard to any claims or disputes covered by this DRA. If Employee files a lawsuit for any such claims, including for those arising out of his or her employment, the Company may use this DRA to request a court to dismiss the lawsuit and require the Employee to participate in binding arbitration herein provided. The dispute resolution procedures described herein survive the termination and/or cessation of employment of any Company employee.

*Id.* at 1–2. The DRA expressly mentions that Title VII claims fall under the scope of the agreement. *Id.* at 1. ("An example of some, but not all, of the types of claims covered by the DRA are . . . claims arising under any statutes or regulations applicable to employees or applicable to the employment relationship, such as the Civil Rights Acts (Title VII and § 1981)").

The DRA also contains a delegation provision[2] giving an arbitrator the authority to resolve questions relating to whether the DRA applies. The delegation provision in the DRA states:

> The Arbitrator shall have the exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, or formation of this DRA, including, but not limited to, any claim that any part of this DRA is unenforceable, void, or voidable.

*Id.* at 2.

**II.   DISCUSSION**

The Federal Arbitration Act ("FAA") provides that an arbitration agreement is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. A party to an arbitration agreement "may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." *Id.* at § 4. A two-step analysis is applied to determine whether a party may be compelled to arbitrate. *Sherer v. Green Tree Servicing LLC*, 548 F.3d 379, 381 (5th Cir. 2008).

---

[2] A delegation provision is an "agreement to arbitrate . . . 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 69 (2010).

3

First, the Court must determine if the party has agreed to arbitrate the particular dispute. *Id.* If so, the Court must then ask whether "any federal statute or policy renders the claims nonarbitrable." *Id.* (quoting *Wash. Mut. Fin. Group, LLC v. Bailey*, 364 F.3d 260, 263 (5th Cir.2004)).

### A.     Agreement to Arbitrate

The first step requires a two-prong inquiry to determine whether the parties agreed to arbitrate the particular dispute. *Klein v. Nabors Drilling USA L.P.*, 710 F.3d 234, 236 (5th Cir. 2013). A court must first determine whether a valid agreement to arbitrate exists between the parties. *Id.* Second, the court must determine whether the dispute in question falls within the scope of the arbitration agreement. *Id.* Thus, the Court must first decide whether the February 6, 2014 DRA is a valid arbitration agreement between the parties, and if so, whether Ell's claims are covered by the terms of that agreement.

####     1.     *Validity of February 6, 2014 DRA*

State law contract principles control whether the parties made a valid agreement to arbitrate their claims. *Klein*, 710 F.3d at 236. Under Louisiana law, a valid contract requires "(1) the capacity to contract (La.C.C. art. 1918); (2) mutual consent (La.C.C. art. 1927); (3) a certain object (La.C.C. art. 1971); and (4) a lawful cause (La.C.C. art. 1966)." *Gipson v. Fortune*, 30 So. 3d 1076, 1079 (La. Ct. App. 2010). Ell contends that the DRA is not enforceable under Louisiana law because the DRA has an unlawful cause and an unlawful purpose, and he did not truly consent to the delegation provision or arbitration clause because both are unenforceable contracts of adhesion. *Pl.'s Opp'n* 2, Doc. 32. As will be discussed below, the Court finds that both the delegation provision and the DRA are enforceable contracts because there is a lawful cause, object, and Ell consented to the agreement.

4

a) *Validity of Delegation Provision*

Ell argues that the delegation provision is unenforceable because it gives the arbitrator exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, or formation of the DRA. *See Pl.'s Opp'n* 1–5. The court "must resolve any issue that calls into question the formation or applicability of the specific arbitration clause that a party seeks to have the court enforce." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010). Courts should order arbitration of a dispute "only where the court is satisfied that neither the formation of the parties' arbitration agreement *nor* (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue." *Id.* at 299. However, when a party "contests either or both matters, 'the court' must resolve the disagreement." *Id.* at 299–300. In *Douglas v. Regions Bank*, the Fifth Circuit held that a delegation provision is valid if the parties "clearly and unmistakably" have agreed to arbitrate whether a particular claim is subject to arbitration. 757 F.3d 460, 462 (5th Cir. 2014). Thus, it is for a court to decide whether an arbitration agreement was formed, and the parties may agree to allow an arbitrator to decide the scope or applicability of the arbitration agreement. *See Granite Rock*, 561 U.S. at 297.[3]

In the instant case, the delegation provision gives the arbitrator exclusive authority to resolve questions of "interpretation, applicability, enforceability, *or formation* of this DRA." *See Notice to New Employees/Re-Hires* 2, Doc. 7-2 (emphasis added). To the extent the delegation provision purports to give the arbitrator exclusive authority to decide whether the DRA was

---

[3] *See also Rent-A-Center*, 561 U.S. at 71 ("If a party challenges the validity under § 2 of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that arbitration agreement."); *Will–Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 218 (5th Cir. 2003) ("[B]ecause arbitration is a matter of contract, where a party contends that it has not signed any agreement to arbitrate, the court must first determine if there is an agreement to arbitrate before any additional dispute can be sent to arbitration.").

formed, it is unenforceable because the court, not the arbitrator, must initially resolve the dispute of whether there is an agreement to arbitrate.

Although the portion of the delegation provision giving the arbitrator exclusive authority to decide issues of formation is unenforceable, the remainder of the delegation provision—giving the arbitrator authority to decide enforceability or applicability of the DRA—is valid. On its face, the delegation provision specifically gives the arbitrator authority to decide the questions of its interpretation, applicability, or enforceability. Thus, the remainder of the delegation provision is enforceable because it "clearly and unmistakably" gives the arbitrator authority to resolve the questions of applicability or enforceability. *See Douglas*, 757 F.3d at 462 ("Parties may agree to arbitrate whether a particular claim is subject to arbitration so long as they clearly and unmistakably do so in their agreement.") Accordingly, Ell's argument fails to the extent that the delegation provision is unenforceable because it gives the arbitrator exclusive authority to resolve any dispute relating to the interpretation, applicability, or enforceability of the DRA.

b) *Validity of the Entire DRA*

In evaluating whether to invalidate an arbitration agreement as a whole, the Court's role is to determine whether a valid agreement to arbitrate was formed, but the Court may only invalidate an arbitration agreement on generally applicable contract defenses, including fraud, lack of consent, duress, or unconscionability. *Rent-A-Center*, 561 U.S. at 68. Ell argues that the entire arbitration clause is unenforceably adhesionary because the delegation provision contained within it "does not allow for any interpretation or application whatsoever that would recognize the court's jurisdiction and authority to decide the validity and enforceability of this contract." *Pl.'s Opp'n Mem.* 8–9, Doc. 32.

6

First, the Court notes that the Supreme Court has held that delegation provisions serve as separate, antecedent arbitration agreements that are enforceable on the same terms as any other arbitration agreement. *Rent-A-Center*, 561 U.S. at 71. Therefore, because a delegation provision is a separate, severable arbitration agreement, then even if the entire delegation provision here were invalid, it has no effect on the validity of the remainder of the DRA. *See id.*

Second, the delegation provision is unenforceable only as it pertains to preventing the court from deciding whether an arbitration agreement was formed, but is valid as it relates to the interpretation and enforceability of the DRA. Therefore, the court may invalidate the entire arbitration clause within the DRA based on general contract defenses, including adhesion and unconscionability.

Under Louisiana law, a contract of adhesion is "a standard contract, usually in printed form, prepared by a party of superior bargaining power for adherence or rejection of the weaker party." *Ndanyi v. Rent-A-Center, Inc.*, No. CIV.A. 04-1769, 2004 WL 3254516, at *3 (E.D. La. Dec. 11, 2004). An unequal bargaining position is evident when the contract unduly burdens one party in comparison to the burdens imposed upon the drafting party and the advantages allowed to that party. *Golz v. Children's Bureau of New Orleans*, 326 So. 2d 865, 869 (La. 1976); *See Iberia Credit Bureau, Inc. v. Cingular Wireless LLC*, 379 F.3d 159 (5th Cir. 2004) (holding that an arbitration clause was unconscionable due to its high degree of burden on only one of the parties by forcing one and not the other to arbitrate all disputes). Meanwhile, in *Simpson v. Pep Boys-Manny Moe & Jack, Inc.*, a Louisiana appellate court rejected the plaintiff's argument that an employment arbitration agreement was adhesionary because their consent was not freely given due to unequal bargaining power. 847 So. 2d 617, 622 (La. Ct. App. 2003). In *Simpson*, the court

focused on the fact that the accepting party had the ability to find work elsewhere if he did not want to be bound to arbitration. *Id.*

In the instant case, there is not a high degree of burden on only one of the parties—both the delegation provision itself and the DRA as a whole bind both parties to arbitration, not just Ell. Furthermore, Louisiana case-law demonstrates that a provision stipulating mandatory arbitration is not unconscionable. *Simpson*, 847 So. 2d at 622. Therefore, the Court finds that both the delegation provision and the entire DRA are not unenforceable contracts of adhesion. Having concluded that both the delegation provision and the DRA as a whole are not adhesionary contracts, both constitute an agreement with a lawful object and cause. Moreover, there is no dispute that Ell signed Turner's February 6, 2014 DRA, and that Ell's signature and subsequent employment clearly indicated his consent, and therefore constituted his acceptance. Accordingly, the Court finds that Ell and Turner, both having the requisite capacity, mutually entered into a contract through Ell's signing of the DRA dated February 6, 2014.

### 2.   *Scope of February 6, 2014 DRA*

Once it is determined that a valid agreement to arbitrate exists between the parties, the "strong federal policy favoring arbitration" applies to determine whether the controversy falls under the terms of the agreement. *Klein*, 710 F.3d at 236–37. Ambiguities regarding the scope of the agreement are resolved in favor of arbitration. *Id.* at 237. Ordinarily, whether a claim is subject to arbitration must be decided in the first instance by a court, not an arbitrator. *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986). Parties may agree, however, to arbitrate whether a particular claim is subject to arbitration so long as they clearly and unmistakably do so in their agreement, and the assertion that the claim at hand is within the scope of the arbitration agreement is not "wholly groundless." *Douglas*, 757 F.3d at 465. The "wholly groundless" inquiry

allows the court to refuse to compel arbitration when the assertion that a particular dispute between the parties falls within the scope of the arbitration agreement is wholly groundless. *See id.* at 464.

As discussed above, the delegation provision here satisfies the "clear and unmistakable" requirement because it specifically gives the arbitrator authority to decide the questions of its interpretation, applicability, or enforceability. The issue here is whether it is wholly groundless to assert that Ell's Title VII claims are subject to arbitration. Ell argues that the DRA does not cover his claims arising before February 6, 2014, but instead that the terms of the DRA only apply to claims arising out of his employment after February 6, 2014.[4] Conversely, Turner argues that the language in the DRA covers all claims that Ell has against Turner, including claims that arose between May 24, 2012–January 6, 2014.

The language of the DRA is broad—it applies to "any and all claims, disputes or controversies" arising out of Ell's employment with Turner. The "any and all" language demonstrates that the DRA could plausibly apply to any claim that Ell has against Turner (arising out of his employment), regardless of when the facts giving rise to the claim occurred. Considering the broad language of the agreement, the Court finds that it is not "wholly groundless" to assert that the DRA signed on February 6, 2014, applies to Ell's claims. Therefore, Ell and Turner have a valid agreement under state law to arbitrate Ell's Title VII dispute, and it is for the arbitrator to decide whether his claims arising prior to that date are subject to arbitration.

### B.     Arbitrability Under Federal Law

Having concluded that Ell has agreed to arbitrate this particular dispute, the court must next determine whether "any federal statute or policy renders the claims nonarbitrable."[5] *Sherer*, 548

---

[4] There no question that Ell's Title VII claim is the type of claim covered by the arbitration provision because the arbitration provision at issue explicitly mentions Title VII. *See Notice to New Employees/Re-Hires* 1, Doc. 7-2.
[5] The Court ordered supplemental briefing in this matter, largely due to the Court's concern over compelling arbitration of an individual's claims under Title VII—a statutory scheme designed to vindicate an individual's constitutional right

F.3d at 381. The Court reluctantly holds that Supreme Court and Fifth Circuit precedent bind this Court to compel arbitration of Ell's Title VII claims because no federal statute or policy renders Ell's claims nonarbitrable.

A provision in an employment contract that explicitly states that an individual's statutory discrimination claims are subject to binding arbitration is enforceable under federal law. *See 14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 259 (2009) (holding that an arbitration provision in an employment contract requiring employees to arbitrate statutory discrimination claims under the ADEA need only be "explicitly stated" to be enforceable); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991); *Alford v. Dean Witter Reynolds, Inc.*, 939 F.2d 229, 230 (5th Cir. 1991). A party should be held to an arbitration agreement unless Congress has evinced an intention to preclude such a waiver of judicial remedy, which is demonstrated by: (1) the text of the statute, (2) its legislative history, and (3) an inherent conflict between arbitration and the statute's underlying purposes. *Gilmer*, 500 U.S. at 26. According to the Fifth Circuit, Congress has evinced no such intention for claims arising under Title VII. *See Alford*, 939 F.2d at 230.

In *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991), the Supreme Court held that an individual employee who agreed individually to waive his right to a federal forum could be compelled to arbitrate a statutory claim for age discrimination under the Age Discrimination in Employment Act of 1967 ("ADEA"). As it pertains to the ADEA, the Supreme Court held that Congress has not evinced an intention to preclude the waiver of the judicial forum. *Id.* Neither the text of the ADEA nor its legislative history explicitly precludes arbitration. *Id.* Also, there is not an inherent conflict between arbitration and the ADEA's underlying purposes because of the Equal Employment Opportunity Commission's mandate to resolve claims of discrimination

---

not to be discriminated against in the workplace. *Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 756 (1979). Counsel for both Ell and Turner ably provided this Court with memoranda addressing these issues (Docs. 27 & 28).

10

through informal means outside of court strongly suggests that arbitration was consistent with the statutory scheme established by Congress. *Id.* at 29. Finally, the Supreme Court addressed the policy considerations against allowing arbitration of discrimination claims, stating that attacks on the arbitral process were "insufficient to preclude arbitration of statutory claims." *Id.* at 30. Specifically, the Court noted that "generalized attacks on arbitration 'res[t] on suspicion of arbitration as a method of weakening the protections afforded in the substantive law to would-be complainants,' and as such, they are 'far out of step with our current strong endorsement of the federal statutes favoring this method of resolving disputes.'" *Id.*

The Fifth Circuit subsequently extended the holding of *Gilmer* to include claims arising under Title VII. *See Alford*, 939 F.2d at 230. In *Alford*, the Fifth Circuit had initially affirmed the district court's refusal to compel arbitration of a Title VII claim under the FAA. *Id.* at 229. On Dean Witter's writ application, the Supreme Court remanded to the Fifth Circuit for reconsideration in light of its decision in *Gilmer*. *Id.* The Fifth Circuit analogized to *Gilmer*, reasoning that "both the ADEA and Title VII are similar civil rights statutes, and both are enforced by the EEOC," and therefore the Fifth Circuit had "little trouble concluding that Title VII claims can be subjected to compulsory arbitration." *Id.* at 230. Finally, the Fifth Circuit stated that any broad public policy considerations against arbitration were "necessarily rejected" by *Gilmer*. *Id.*

Subsequently, in *14 Penn Plaza* the Supreme Court held that a plaintiff may be compelled to arbitrate individual civil rights claims under a collectively-bargained agreement, as long as the agreement to arbitrate statutory antidiscrimination claims is "explicitly stated." 556 U.S. at 251. The Court found that the arbitration provision at issue "[met] that obligation," because the provision expressly stated that all claims arising under Title VII and the ADEA were subject to an arbitration procedure which was the sole and exclusive remedy for employees. *Id.* at 252, 258–59.

In the instant case, Ell signed an employment contract which explicitly included an arbitration provision. The arbitration provision explicitly names Title VII claims as among the claims that must be submitted through binding arbitration. Jurisprudence from the Supreme Court and the Fifth Circuit have established that Title VII claims can be effectively heard in arbitration, and there is no contrary public policy requiring Title VII claims be submitted to a judicial forum. Because there is no federal statute or policy which renders the Title VII claims nonarbitrable, the Court is bound to compel Ell to arbitrate his claims in this matter.[6]

The Court notes its concern with employment contracts that mandate arbitration of statutory claims of individual rights. Originally, the FAA was enacted to legitimatize arbitration agreements between businesses. *Gilmer*, 500 U.S. at 39 (Stevens, J. dissenting). The legislative history of the FAA reveals that it was never intended to apply to claims by individual's against his or her employer. At the Senate Judiciary Subcommittee hearings on the proposed bill, the chairman of the ABA committee responsible for drafting the bill assured the Senators that the bill "is not intended [to] be an act referring to labor disputes, at all." *Id.* (citing Hearing on S. 4213 and S. 4214 before a Subcommittee of the Senate Committee on the Judiciary, 67th Cong., 4th Sess., 9 (1923)). Instead, the FAA "is purely an act to give the merchants the right or the privilege of sitting down and agreeing with each other as to what their damages are, if they want to do it. Now that is all there is in this." *Id.* However, the Supreme Court has interpreted the FAA to extend far beyond what it was ever intended, and now covers numerous claims that are vital to individuals. The Court fears that arbitration of Title VII claims "cripples their effectiveness and weakens the claims' social

---

[6] Turner requested the Court to dismiss this case, or alternatively to stay this matter pending arbitration with an order directing the plaintiff to institute an arbitration within 30 days. The FAA dictates that a court must stay a case in which a party has shown that an issue in the suit is subject to arbitration under a written agreement. 9 U.S.C. § 3. However, the Fifth Circuit has held that when all of the claims in a case are subject to binding arbitration, the court has the authority to dismiss the case. *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992). Because all of Ell's Title VII claims of employment discrimination and retaliation are both covered under the terms of the valid February 6, 2014 DRA which mandates binding arbitration the Court has authority to dismiss the case.

value." Mary Rebecca Tyre, *Arbitration: An Employer's License to Steal Title VII Claims?*, 52 Ala. L. Rev. 1359, 1359 (2001). The Court agrees wholeheartedly with its colleague in the Eastern District of Pennsylvania:

> This current state of legal affairs is lamentable. Workers of [Turner Industries], as part of their desire to work, signed away their rights to bring a multitude of claims in court. Employers such as [Turner Industries] hold all of the cards here; [Turner Industries] can easily inform prospective applicants that if they do not like the terms of the deal, the applicants can just try to work in a different neighborhood. Its workers must therefore chew on a distasteful dilemma—give up certain rights or give up the job. These agreements are not more palatable because [Turner Industries'] arbitration agreement includes form language that the employee has had the opportunity to read the agreement and seek legal counsel prior to signing it. This is, of course, fantasy. How many [Turner Industries workers], newly hired by [Turner Industries], when presented with the dispute resolution program, seek legal advice about their options? The Court will hazard a guess that the number is very few. Most start their jobs and toil without issue. But it is only when a problem arises that the importance of giving up the right to air one's grievances to a court . . . takes on extreme importance.
>
> The increasing frequency with which these arbitration clauses and class action waivers are employed is unfortunate, and in many situations, unjust. There is a reason that arbitration is the favored venue of many businesses for deciding employment disputes, and it is not to ensure that employees are afforded the best chance to have their claims adjudicated by a judge or jury picked from the community. This Court, however, is not at liberty to ignore the decisions of the United States Supreme Court and the [Fifth] Circuit Court of Appeals.
>
> * * *
>
> Most of the time, the employer/employee relationship is a fruitful, congenial one, without incident. Employees do their work and cash their checks. Employers maintain decent working conditions and, they hope, run a successful business. Moreover, when an incident does arise, it is often settled before resorting to an adversarial process. But there exist circumstances when the issues are too complicated, the parties are too upset, or too much is at stake—in other words, when it really matters—when a judge and jury need to step in. Unfortunately, mandatory individual arbitration often steps in to close the courtroom to those individuals who need to use the courts. From the perspective of the employee, it is foolish for him or her to give up the rights to pursue litigation in court and to pursue those rights collectively. The permissibility of surrendering those rights, however, is no longer in doubt legally.

*Porreca v. Rose Grp.*, Civil Action No. 13-1674, 2013 WL 6498392, at *15–16 (E.D. Pa. Dec. 11, 2013).

## III. CONCLUSION

For the reasons stated above, the Court is bound to compel Ell to submit his Title VII claims to binding arbitration because he has agreed to arbitrate the particular dispute and there is no recognized federal statute or policy that renders the claims nonarbitrable. Accordingly, the defendant's Rule 12(b)(1) Motions to Dismiss and Compel Arbitration (Docs. 5 & 31) are **GRANTED**.

Signed in Baton Rouge, Louisiana, on March 3, 2016.

_____
**JUDGE JAMES J. BRADY
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**